PPL EnergyPlus v. Solomon Mr. Engel. Thank you, Your Honor. My name is Richard Engel. I may please the Court. I am a Deputy New Jersey Attorney General representing the President and the members of the New Jersey Board of Public Utilities. Your Honors, we believe this case, while it has a complex set of facts, is actually simple in a way to be legally resolved. What New Jersey did here was to encourage the building of new power plants, and it did so by setting up a financial mechanism that would allow those plants to be built within the mechanism of the Federal Power Act, within the context of the Federal Power Act. And thus, it's our belief that this law is not preempted by the Supremacy Clause, and therefore, that the District Court decision should be reversed and the injunction lifted. My colleagues will discuss in more detail the preemption arguments, and Ms. Kindle will discuss the point of view of the other states. And I'd like to reserve three minutes, Your Honor, for the two for me and one for Mr. Elgarten at the end of the argument, beyond the five minutes I have and the four and three the others have. But what I'd like to do is discuss for you, I believe, what's important, and that's the context that the law was enacted under. New Jersey's law was enacted to solve a very important problem, and that was that the – and one that this Court has long recognized is within the province of the states, and that is to provide safe, reliable, and more recently, environmentally friendly power to the citizens of New Jersey. And so what New Jersey did was got together the legislature in 2010 and was being told – the legislature and the Board of Public Utilities were being told that there was an imminent concern that there was going to be a lack of power in New Jersey that needed to be somehow resolved. And this is by the actual plaintiffs in this case came to the Board of Public Utilities and said, we need to do something to resolve this imminent power problem that's coming up. And so one of the ways that they were going to do this was to build a new transmission line, for example, that they thought would resolve the problem, which, by the way, was going to be fully guaranteed funded by the rate payers of New Jersey and a profit for the utility. So this mechanism of giving people a profit and funding by the rate payers is not unusual. In fact, it's often used. So New Jersey is sitting there and the legislature is saying, we've got a big problem. We might be faced with rolling blackouts or brownouts, et cetera. What do we do to solve this problem? And they came up with a mechanism that sincerely was believed to be within the context of what FERC allows, and that is they adopted this financial mechanism called the SOCA, S-O-C-A, also sometimes known as a Contract for Differences, that would allow the most efficient method of getting new power plants that were useful to be built as quickly as possible. And so what New Jersey's legislature realized that this could only be done as part of this method was with a stable source of revenue for these people. No New Jersey power plants were being built. Clearly, the mechanism that had been set up by the FERC context was not working. How does this SOCA help the generators or the power plants? How does it help New Jersey build new plants? Maybe you can tell me how that works. Sure, Your Honor. What happens is, in addition to the rate that they will receive by selling into the PJM market, they will get a subsidy from the utilities, ultimately paid for by the rate payers. That was contingent on the auction price, wasn't it? Correct. I mean, they have to bid into the auction, just as every other new generator, clear the auction, and then if that auction price wasn't sufficient to guarantee them enough revenue to build a power plant, then they would get a separate subsidy from the utilities, ultimately from the rate payers. You said that you're not going to address preemption, but it seems like this goes to the heart of preemption. Well, it does, Your Honor. I'm trying to set it in context because my colleagues will go into it a little more detail, but yes, it does. And I'll get to that in a second, Your Honor. Time goes very quickly. No, I understand, Your Honor. I understand. So again, if you want me to sit down, I will, but I just wanted to follow up on one more point, and that is that the generators that were selected under the rules here followed the rules. They did everything that the FERC allowed them to do. And therefore, we don't understand why, all of a sudden, in their amicus brief, FERC is changing its position when their own MOPR orders have allowed the exact mechanism that's being used here. Okay. Mr. Riegel, thank you very much. Can I ask you one thing? That problem that you were alerting to, the reason for which this whole thing was set up, that has abated considerably, hasn't it? Well In other words, the fears that New Jersey had about brownouts and blackouts and so forth, that doesn't really exist anymore, does it? I wouldn't say it doesn't exist, Your Honor. I would say, I guess we were, I don't know if you can use the term, lucky that the economy had problems, and therefore, that there wasn't as much demand for power as they originally thought. But I believe that there still is a very great concern out there in the Board of Public Utilities that if we don't do something, there will still be problems. Thank you, Your Honor. Thank you, Your Honor. Mr. Elgarten. Good morning. I represent CPV Power. Mr. Elgarten, can I ask you to begin by addressing the response to what I understand to be part or the response to your argument or the argument that was just foreshadowed about the FERC 2011 change to the MOPR rules? The response is in part, as I understand it, that that deal with the, it dealt with revenues. It didn't deal with the price that was offered. No, it dealt with the price that was offered and the capacity options. No, I understand that, but that the argument that the subsidy that the New Jersey statute provides deals with the price that comes out, the revenues, what was received. Yes. The change to the MOPR rules dealt with the amounts of bid and the different ends. Yes. So the argument is that, as I understand it, that by changing the price received, by adding to the price received, you've done something very different from what FERC approved in 2001. Well, that's not actually the argument that we understand is being made. The argument that's being made or was suggested by the district judge, but I note that appellees actually withdrew this at the trial court level, was that there's some effect, yes, they did, and we cited the provisions, and they've receded from it in their briefs, that the effect of this subsidy, this payment in addition to what is bid into the auction somehow has a negative effect on the auction itself. If that is the conflict, well, that is the conflict that was certainly resolved by FERC's rule changes, if they felt there was a conflict, by FERC's rule changes that determined that the participation of the SOCA-supported generator in the process was that disruptive. FERC clearly held, clearly and explicitly held that it is not disruptive. The original rules, frankly, had given a blanket exemption for all such support. They've changed the rules. The NJBPU decision covers this in great detail, but the conclusion of FERC in that circumstance was that there was no negative effect. Indeed, it's to the contrary, that the participation of a SOCA-supported generator is a competitive resource, and it's a competitive resource that we bid properly into the auction and cleared the auction and then went forward to start the construction on the power plant. But there's no question that the SOCA, the payments paid through SOCA to the generators is contingent on the auction. I mean, isn't that accurate? It is absolutely contingent because it would be darn foolish, excuse me, darn foolish for the state to give a subsidy that was beyond what the, if they were able to recover the resources in the market. But the requirement to bid in the auction was always to bid in the auction at whatever rules that FERC makes for control of that auction. So the generators bid a minimum, minimum, or they bid competitively, doesn't matter because they're going to be guaranteed the difference through SOCA anyway. They are, but so the... My point is, doesn't that manipulate the auction? It doesn't manipulate... Doesn't that have a negative effect on the auction? I mean, it's supposed to be a level playing field, but when one player is incentivized to bid the minimum because it has nothing to lose, doesn't that affect the auction? No, because FERC determined that it did. I didn't think you'd agree with me. No, no. What about the fact that it's the rate received though? I mean, it's still the rate received whether it impacts the auction or not. Right. How does it not? That's what I thought your question was. Why was the district wrong in saying it was a rate received? It is not a rate received, and that goes to the field preemption. It's not a rate received because FERC's exclusive jurisdiction over rates and charges, and this is a fine point, but it's an important point. FERC's exclusive jurisdiction over rates and charges is limited by Section 201 of the FPA. That is literally for the payment of the exchange of the sale of capacity. This is not for that. This is an additional supplemental payment above and beyond the actual sale and capacity. It is covered by the FPA, but it is not covered by the exclusive jurisdiction provisions of the FPA. 205 and 206 give FERC non-exclusive jurisdiction over everything in the universe that affects rates, but that's not exclusive. How is it limited? How is which limited? The jurisdiction over the wholesale rates in the auction format. Because 201 defines the exclusive jurisdiction of FERC, and it is a finely defined jurisdiction that relates to the period of Attleboro. So is the result of following your argument that we might find conflict preemption, but we could not find field preemption? Well, my first argument is you can't find either preemption. So the first one you can't find because the in connection with idea or the affecting rate is not part of the exclusive jurisdiction of FERC until FERC takes that jurisdiction in hand and exercises that jurisdiction, and then you have a review proceeding. So that's one reason you can't find field preemption. You can't find conflict preemption because of two reasons. The standards the Supreme Court has set for finding it is when the accommodation of a state action in its proper sphere, building a power plant, and they've been subsidizing and building power plants for years. When it affects FERC jurisdiction, you have to find that the effect is so, and the words are disruptive and extensive, then it can't be accommodated. Here we know that could not have happened because FERC readily accommodated it and determined that there's no conflict with the auction. Now, of course, it affects, this is Judge Fuente's question, it of course affects the market. That's the whole reason you build power plants is so you have more capacity, and as they said in the CPUC case, the Connecticut case, everything you do to either build or not build is going to affect the market. But does it affect it in a bad way that is disruptive of the auction? And FERC ruled on that, and this Court affirmed in NJBP. Is it then your position that FERC's authority over interstate wholesale capacity rates is limited? No. FERC's authority is different from its exclusive jurisdiction. The exclusive jurisdiction is the field in which it preempts states from action. But its authority then is not limited. Their authority is very, well, it is limited, but it is a broad authority to take actions to protect its market under Sections 205 and 206, the in connection with and the effects. Maybe I misunderstood you. Just to clarify. So you say it's jurisdiction over interstate wholesale rates. Absolutely. It's limited. That is a complete plenary authority over those rates which are preemptive of state authority, and that is the Attleboro decision. You can't regulate, you can't dictate a rate. That seems to cut against what the Federal Power Act says about FERC's jurisdiction. It is actually not. And this is why I thought it was important to clarify the point. The Federal Power Act in Section 201 is the jurisdictional provision, A and B, of 201. It's 824. And that is exclusive. And we know that because it is Attleboro. That's an old Supreme Court case. You can't regulate directly that sale. And if the state dictates the rates, it's not it is clearly violating Attleboro and the law and invading FERC jurisdiction. But Congress in its wisdom, and it is great wisdom, gave FERC a broader remedial authority and regulatory authority than just that exclusive jurisdiction. So their remedial authority extends to everything that affects rates, if it is urgent and important. But when it exercises that authority, it doesn't preempt the universe. It has to engage in a regulatory action with notice and a hearing and people appear. And then those rulings, which are in the form of a tariff, an exercise of remedial authority, which is discretionary, have to appear in a rule. Then we take it up to the Court of Appeals. And within that sphere, it's regulated. Your time ran quite a bit ago. So we'll have to go on to the next counsel. Mr. Zuckerman? Yes. Thank you, Mr. Legarten. May it please the Court, I'm Richard Zuckerman. I represent Hess Newark, which is building a 625-megawatt power plant in Newark, New Jersey, and has entered into socas with each of the four electric distribution companies in New Jersey. The LCAP Act was drafted with the field between, the boundary between the state field and the federal field precisely in mind. What the LCAP Act does is it uses the state's authority over the local distribution of energy to incentivize power generation. Both the local distribution of energy and power generation are firmly within the state field as defined by the federal power act. May I ask a question here? Yes, sure. One of the arguments made is that there are, an important part of this market is bilateral agreements. That's correct. That operate independently of the auction. That's right. And that do provide, through these voluntary arrangements, additional or supplemental or separate revenue or rate parameters. But they don't go through the auction. Was there consideration in the process that you've described that gave rise to the New Jersey statute of a mechanism that didn't go through the auction, that wasn't tied to and triggered by the requirement of auction prices in order to achieve the end that you've just described? I'm not certain what consideration of that was done, Your Honor, but this is a perfectly permissible way to do it and is, in fact, extraordinarily respectful of the federal field. Because the problem is that it's contingent on the auction. I thought the question was a good question. Can't this be done without having to implicate the auction and having the SCOCA agreement or SOCA agreements contingent on the auction? It could have been done that way. In other words, private agreements. It could have been done that way, but the issue before this Court is whether the method that was chosen by the state of New Jersey is permissible and whether it respects the boundary between the state field of regulation and the federal field of regulation. And if one looks at how the SOCAs actually operate, it's clear that it does respect that. The SOCA payments are payments that are made by the electric distribution companies, which operate exclusively in the state field, and they're made to power generators, which, in their role as power generators, operate exclusively in the state field. Because no doubt, and at this record, I was fairly careful about this, but it did make a specific finding saying that the performance of the SOCAs is contingent upon clearing the RPM auction. That's correct. They're joined at the hip, it seems like. The SOCAs are contingent on clearing the RPM auction, but let's look at whether it would have been more respectful of the federal field not to have that requirement in place. What happened here is that there were three generators chosen and approved under the LCAP Act. CPV, HESS, and NRG. They all bid into the auction. CPV and HESS cleared the auction. NRG did not. At the time you did that, were you subject to the 2011 MOPR rules? All of them were under the 2011 MOPR 2 in the 2012 auction. So if the objection is that it was contingent on clearing the auction, then the argument on the other side has to be that the LCAP Act would have been just fine had the SOCAs for all three generators, CPV, HESS, and NRG, come into effect. Now that makes no sense, because NRG, having not cleared the auction, in accordance with the FERC promulgated rules, was found under those FERC promulgated rules not to be an economic entry. So it would have been a far greater intrusion into the federal field to say, well, we're going to give these subsidies whether or not to clear the auction. And there's no intrusion whatsoever into the federal field where it works the way that it does, which is that it says clear the auction, follow the federal rules, the FERC rules in that auction, and then you will receive an out-of-market payment, not from the purchaser in the auction, but from the electric distribution company, keeping in mind that the electric distribution company doesn't purchase capacity. But the payment that's made depends on what happens at the auction. The payment that's made, the size of the payment that's made is determined by the clearing price, but that doesn't cause it to invade the federal field, because the principle is that this is an out-of-market payment. Whether that out-of-market payment is – whether the size of that out-of-market payment is judged according to the auction price or is determined separately, such as a fixed rate out-of-market payment, the net result is that the power generator receives two payments, one for selling capacity and – which it receives from the purchaser of capacity, PJM, and the other as an out-of-market payment from a different counterparty. But it's for the same thing, for the provision of the capacity. It's not for the same thing. It's a requirement that the capacity have been sold in order to receive the out-of-market payment. The same way, under renewable energy certificates, in order to get the payment under the renewal energy certificate, the electricity has to be sold. But it really doesn't matter what the generator bids, in a sense, because the generator is going to be made whole no matter what. So it seems like it makes the bidding process academic. I mean, it's not going to affect what the other players are going to bid. They can just go in there and bid. Can they bid zero? They cannot. The LCAP generators can't bid zero, and the reason they can't bid zero is that in MOPR 2, FERC held the LCAP generators can't bid zero. They have to bid under the FERC-regulated rules applying the unit-specific review process, which means that these generators, the LCAP generators, will be reviewed based upon their costs, and if it's determined that they're economic entry and that the market, therefore, will benefit from their participation, they should be allowed to bid. But isn't that only for one year, or do you get that for more than one year? They're required to bid for one year. Just one year. So thereafter, the SOCA goes on for 15 years. That is correct. So to Judge Fuente's point, then, after year one, could one bid zero? If FERC so provides, yes. If FERC does not provide, no. Is there anything that FERC has said that would forbid that? That is, the 2011 rule changes don't speak to that, correct? The 2011 rule changes would allow that. Can you address – I'm sorry to interrupt, but actually I do. Can you address the question that Judge Schwartz just raised, then, which is the effect of the much longer guarantee than is provided by FERC and the argument that the – I think the acronym is NEPA – that the NEPA adjustment is – that that could be longer than one year, only goes to three years, and that New Jersey tried to get FERC to go for a longer period. FERC said no. New Jersey is doing it this way, and FERC has already rejected that as an option to help subsidize and therefore facilitate new construction. FERC, in setting rates for the sale of capacity, rejected a longer-term position. FERC doesn't have jurisdiction over out-of-market payments that are done separately by a different counterparty, even if they relate to or are contingent upon clearing in the capacity market. So the fact that FERC has chosen in rate-setting not to provide for a longer timeframe does not mean that New Jersey, in arranging for an out-of-market payment, which it's entitled to do under the Federal Power Act, made by the electric distribution companies in the state field under the Federal Power Act, will be entirely permissible. I take it your point would be that the SCOCA agreements and the – well, let's just say the SCOCA agreements have no effect on the wholesale energy rates. Any construction – any construction of capacity is going to have an effect on the energy rates. If New Jersey – if New Jersey decided to subsidize the construction of power plants just for intrastate distribution of electricity, where all of the electricity would be consumed within the state, clearly outside of FERC's jurisdiction, that would have an indirect effect on the PGM market. And the reason it would have an indirect effect on the PGM market is it would remove the customers who are now served by intrastate power plants from part of the load that was being serviced by the PGM market. So any construction of capacity will have an indirect effect. That's intrinsic in the structure of the Federal Power Act, and that does not cause an invasion of FERC jurisdiction. MR TONER. Okay, Mr. Zuckerman, thank you very much. MR ZUCKERMAN. Thank you very much. MR TONER. MS KENDALL. Good morning. May it please the Court. I'm Assistant Attorney General Claire Kendall. I represent the Unique States of – who are listed on the brief in a safe time. I'll simply say that we've submitted the same brief before the Fourth Circuit. In addition to the parties in this matter, because we had more time to gather support, we also included the New York, New Jersey, Delaware, and D.C. state agencies as part of joining the same arguments.  MR TONER. Now, the Fourth Circuit case, that's probably the Nazarian case, is that correct? MS KENDALL. Yes, sir. MR TONER. And looking at that case, it seems like it's on all fours with the circumstances in this  Can you distinguish the case, or is it that you simply disagree with its conclusion? MS KENDALL. We disagree – the Unique States disagree with the district court's decisions in both this case and the Nazarian case because of their impact, and I think unintended impact, of the broad jurisdictional sweep in both decisions, but particularly for the case before this Court, finding both field and conflict preemption of what has been traditionally a cooperative, effective, workable split of jurisdictions between the states. And I think the split between the states and the federal realms actually answers the questions that I've been proceeding here in that you've asked, why does ASOCA help New Jersey build power plants, and why doesn't the fact that the payments have to clear in the auction, why doesn't that sort of intrude on FERC's jurisdiction? And I think – let me just set a little context for this. MR TONER. Is the issue of jurisdiction that FERC does not have jurisdiction over the wholesale rates at the auction, at the RPM auction? MS KENDALL. FERC has the right – FERC doesn't set rates, first of all, for that, but they absolutely  MR TONER. I'm wondering, is it a question of jurisdiction or authority, or is it the question that the ASOCA agreements or state agreements have no impact on the auction itself? Either jurisdiction or – MS KENDALL. It's a little more nuanced, Your Honor, if I may. Typical – this is a case of first impression, and which is why the states are so concerned about it. Typically, a challenge under the Federal Power Act is a challenge to FERC's rules applying to FERC's markets and how they may affect the states and other stakeholders. This is the first time we have a state law to address state long-term energy needs under a state procurement paid for by state ratepayers is nonetheless deemed to be field preempted under the Federal Power Act as well as conflict preempted because it might have an effect on the market when anything a state does for a generation will have a, quote-unquote,  MS KENDALL. Well, may I ask a question? I'm trying to drill down, no pun intended – MS KENDALL. Go right ahead. MS KENDALL. – on the effect notion. Part of the issue here is trying to understand the effect that the SOCAs will have on the market, given the 15-year guarantee that the SOCAs provide. MS KENDALL. The SOCA price – SOCA's arrangements will have no effect, and let me tell you why. In the oral argument before this court under the MOPR decision that was just affirmed a month ago, the government represented to the court that 97 percent of the bidders into the auction are price takers. And the reason for that is because power plants are heavily capital-intensive. You need a 15-year stream of income in order to support it, which is why it is a state issue, long-term issue on the local level. The federal government is dealing with short-term capacity markets, and what happens needs to happen on the interstate levels and on the regional levels and on a uniform level, whereas the state is dealing with their own unique circumstances. Some states are resource-constrained. Other states are resource-rich. Some states need transmission lines. Other states need more power plants. There are various – and that is why the Federal Power Act has this dual jurisdiction, and this is why the states are so concerned, because the district court's decision below is sweeping in fact scenarios that were not before the district court that will nonetheless could be applied to our states in a variety of state amici situations and completely eliminate valid, essential state programs that have been traditionally, routinely, decades-long interpretations into this dual jurisdiction. So we're not saying that we have jurisdiction over wholesale rates, and we're not saying that FERC has jurisdiction over generation. What we're saying is that the scheme set up by the Congress and the Federal Power Act, longstanding, allows both realms to work together. And I would say the MOPA rules prove that when FERC – I mean, FERC has addressed this exact same state law, has managed to come to accommodation to deal with its own markets, and there is no need for a conflict because the two can work side by side. So the fact that the state is ensuring there is a financial wherewithal over a 15-year period in order to finance steel in the ground, and that's what it's about. Can you finance steel in the ground power plants? And you can't finance steel in the ground power plants with a one-year financial commitment. Can you – I don't have the cite with me. I wish I did, but the Third Circuit has issued a ruling not too long ago, New Jersey Board of Public Utilities versus FERC. Yes. As I recall, there was a statement in there that specifically said that FERC has wholesale rates. Absolutely, Your Honor. I hope I didn't mischaracterize it. No, you didn't. But, Your Honor, if I may for a moment, let me just grab my own copy. And of course, my question is, isn't that binding on our review? Equally binding, Your Honor, on page 55 of the decision is the fact that what FERC has done is permit the states to develop whatever capacity resource they wish and to use those resources to the extent they wish while approving rules that prevent the choices from adversely affecting their markets. In other words, dual jurisdiction, dual sovereignty, dual efforts. And so FERC has said through its MOPR rules we can accommodate what the states are doing because anything the states do. And let me – I mean, this is why it's so important to the states. Energy conservation rules, energy efficient rules, all procurements, any sort of new generation, 29 states plus the District of Columbia have RPS standards, resource portfolio standards. All of that stuff we typically use bilateral contracts. This is nothing unusual about this case and the circumstances of this case. Okay. Ms. Kinnell, thank you very much. I appreciate it. And we ask that you reverse below and restore what is the typical jurisdiction and certainly do not let it extend beyond the fact circumstances of this case because it really does have a major impact outside this case. Thank you, Ms. Kinnell. Mr. Clement. Thank you, Your Honors, and may it please the Court, Paul Clement for the appellees. Let me start with a point of agreement with the state of New Jersey, which is that I do think this is a simple case, or perhaps straightforward is the better way to describe it because this is a case where the state law essentially, by its own terms, criticizes the federal regime and then makes the payments contingent on the federal regime. And so if you go and look at the first five findings of the LCAP legislation, there are a total of nine, but the first five are all about the federal regime, the federal wholesale market, and why New Jersey is dissatisfied with the results that it's provided. And they specifically talk about NEPA and its three-year timeframe. And they say, I've never seen anything quite like this in a state legislative finding. They say, you know, FERC could have fixed this. They could have worked with us, but they declined to do it. So we have to act. And then it's not just the purpose, but I think the purpose informs the preemption analysis. Then it's the terms of the act. And as Judge Fuentes quite, I think, correctly focused on, what is very distinct about this law and the Maryland order, and it's very different from all of the other things that you've heard about that states can do, is that it's contingent on not just bidding, but then clearing the federal auction. And what that means is that you're essentially guaranteeing that if these companies are allowed to enter, pursuant to the terms of this statute, you're going to get 14 years of zeros. I mean, you know, the first year, they're subject to the MOPR, and I'll talk about why we don't think the MOPR is sufficient. But once the first year is cleared, that's 14 years of zeros. And if you don't think that's going to have an effect on those markets, I don't think you can do math. So the real vice is the combination of the 15-year guarantee and the absence of any constraint on the amount that's bid after the first year? I think it's a combination of those two things. But I think there's even a problem in the first year, which I will try to get to, which I think the MOPR is an effort by the federal agency to try to make a countermeasure to limit the distorting effect of this, but I don't think it accomplishes its full goals. But if I could say one more point before I get to that point, I think that this fact that it's contingent on the bidding and clearing in the federal market, and as a number of your questions pointed out, there are ways for states to subsidize new construction in ways that don't have that requirement. And you could actually do something fairly similar. You could provide, you could figure out what it costs to build a new plant. You could say you're bound and determined to build a new plant, and then you could essentially hit the EDCs, ultimately the rate payers, with what it would take to do that. And actually, I think the 15-year SOCA payment schedule, if I understand it, is a rough approximation of what they have to pay. And you can do it without messing with the federal market at all. So to me, that prompts the question, why are they doing this? And unfortunately, there is a very good answer, which is they, I think, understand that if they can guarantee these products bid into the market and clear into the market, that will have the effect of lowering the price in that market. And since these aren't the only power plants in the world, and there are plenty of other New Jersey power plants that are buying from the wholesale market, if they can use these plants to lower that price, they can essentially get some of the financing for this on the backs of a lower, an artificially lower wholesale price. And that, I think, in a nutshell, is the vice here. Something like that seemed to have happened before, where the bidding was such that the actual price, the clearing price, was being depressed. So in response, if I remember correctly, the minimum offer price rule was put into effect. So it does appear that these rules can be tweaked over time to accommodate problems with regard to the bidding. Why could not PJM do something like that in this case in response to the SOCA agreements? I think this brings in Judge Rosenthal's 15-year issue as well, because you can try to deal in the confines of what I think is affectionately called the MOPR, the minimum offer price rule. You can try to deal with the auction, but all of that auction is based on a three-year forward market. And it's all based on the federal assumption that three years is the right time horizon for drawing in new investment, because that's an appropriate period of time to get cost recovery. Now, New Jersey and Maryland very much disagree. They think they need 10. They think they need 15 years. But here's the thing. I don't think there's any effective way, and the government may disagree with me on this, but I don't think there's any effective way within the confines of that three-year MOPR rule to deal with a 15-year subsidy. And here's the way I think about it, which is it's their own view that but for this 15-year subsidy, these plants won't exist. So it may be that for purposes of the one-year MOPR screen, they can show that their costs of new entry are low enough to justify this, but that's in the confines of thinking about what's the cost of new entry and all these plants with three-year horizons. Their own view is that but for this subsidy, we don't exist. Well, if they don't exist, the price in that wholesale market is a whole lot lower. Can you respond to the argument that if FERC felt its jurisdiction offended or intruded upon, then FERC had ample opportunity to weigh in and still does have an opportunity to regulate if it finds the results distortive, unfair, or unreasonable? Well, Your Honor, I'm happy to do that. I think one thing we've learned about the federal government's position here is that they weren't eager to volunteer it, but when asked, they viewed these state laws as being preempted. Limited. Preempted. Preempted. That's what they mean. Yeah. It should be preempted, however you want to say it. So I think what I would take from that is a couple of things. One is, you know, FERC's views are certain. Now that we've seen them, we certainly think they're very important, and we're happy for you to take those into account. But that said, at bottom, this is an argument that a state statute, not a particular rate proposal, not a particular voluntary contract that might be FERC jurisdictional, but a state statute is unconstitutional because it both intrudes on a federal field and is conflicted and we also think has a dormant commerce clause problem. If the statute was written to have the payment not based upon the present market, but say the language said the SOCA will be dictated based on the three-year average of the three years in the past and you use an average, would that be preempted? I think it still would be, Your Honor. I think there are two things that are absolutely critical here for preemption purposes. I actually think that either one would be sufficient. But one is the bid and clear requirement. So I took your hypothetical to be you still have the bid and clear requirement, but instead of the SOCA being just a function of the clearing price, it ends up being a function of something that's still based on the federal auction, but it's an average. But historically, so it's not affecting the real-time market activity. I wanted to know whether that would be a problem, if that's how the SOCA payment was calculated, rather than the bid today three years ago on an average, something like that. Yeah, and I would still take the position that that is preempted because of two things. One is I think just the bid and clear requirement I think is enough because that's, you know, a state law I don't think really has any business in this realm to say you must clear a federal auction. Why not? Where else are they going to get the power unless they do the bilateral contracts? That's the game in town in the PJM. Well, no, they could do bilateral contracts or they could, you know, if you want to just do subsidies for generation, there's no reason to make it contingent on clearing the federal auction. If you want to have a pure subsidy, you know, presumably you would say we want more of this, and this is how some things work for like solar and things like that. It's not a bid and clear requirement. It's we want more solar, so go bid it. And one way or another, you know, we're state regulators. We'll figure out, you know, if you bid it and clear it, that's great. If you don't, maybe you'll do a bilateral contract. If not, we'll, you know, make the rate payers pay for it. It will all work out one way or another. There are multiple options. So I do think it's very suspicious when you have this bid and clear requirement. The other point, though, is I think the premise of your question is if you did that average, you still wouldn't have the distorting effect. I still think you would have the distorting effect. And to me it's. How would you have it since you're not distorting it on real-time activity? You're using a snapshot backwards. So explain how it would disrupt the market. Because you're still providing essentially a subsidy to something that might not, that by their own hypothesis wouldn't be in the market. And so these plants wouldn't be built but for the subsidy. So you could tie the subsidy to almost anything. And if you have the bid and clear requirement, then you say, I mean, suppose they just said, look, we've, you know, we're going to make it, we're going to pay $200 more than the market clearing price. I think that would be the same case ultimately. It would be a different mechanism to provide ultimately that the provider for the capacity market is going to receive something that's different from the federal rate. So we think it would be field preempted for that reason. And we also think it would be conflict preempted because it would distort that market. There's a lot of different ways to think about the distortion of the market. The way I think about it, though, it's, you know, the simplest way I've thought of thinking about it is to say their own view is they wouldn't exist. And that has hugely distorting impacts because if they exist by virtue of the state law that is preempted, now they're going to come up here and they'll remind you that, well, they could exist by a state subsidy that doesn't, you know, impact this issue. But they are using the federal market to exist essentially. They're pivoting off of it to exist. They're going to distort that. The effect of that is that some plant that has a much better economic profile in Pennsylvania or in Delaware and still would help New Jersey rate payers isn't going to get built. So there's still that distorting effect. So do you agree that subsidies are okay as long as you don't have to also bid and clear? I think that's – I don't want to say that definitively in the sense that I can imagine a subsidy that doesn't have a bid and clear requirement that's still preempted for some other reason. But I do think the bid and clear requirement is, in a sense, a very narrow way but very important way to decide this case. Because if you think about it, what we have here is we have – the states are saying correctly that when it comes to generation, that's generally our field. And we are saying correctly and I think without objection that wholesale rates are our field. And so the bid and clear requirement is really where they take their field and say, well, we're going to sort of link ourselves and we're going to go into your territory. What about bid and clear not being part of the mechanism but a 15-year guarantee still being part of it? Would that raise preemption issues? I think it would. I think it certainly would. We've briefed it in the way we've thought about it because that's more of a conflict preemption concern. And, again, I think it's a very stark conflict because I just – you know, I haven't – like I said, I was very struck by the legislative findings because they – you know, this is not something where the federal government hasn't thought about this or that this is all based on a very traditional state authority. They sort of recognize that since they have decided to go away from the vertical integration model, they're largely dependent on the interstate market for signals of that generation. And they understand that FERC has made a judgment that a three-year time horizon is about right. And, remember, all of that's not just because they like three. You know, they have this very important concern that they don't want to discriminate between existing sources and new sources. That's a very important sort of key policy judgment they've made. And so they've said three years strikes the right balance. Could you talk about whether this is a matter of jurisdiction or authority over the RPM auction market? Well, I want to make sure I'm responsive to the question. The way we think about this is – I'm hearing this is a matter of jurisdiction from the other side, not necessarily a matter of complete authority over the RPM. Yeah, if I understand the argument, the argument is that 201 is preempted,  And we have two basic problems with that way of looking at the world. First of all, we think this still comes within the preempted field of 201. 201 talks about rates and charges. The other related point, though, is I don't really understand why you would sort of artificially sort of say, well, 201 is about the preemptive scope, and 205 and 206 are just about FERC's jurisdiction. I think if you're reading the statute, you read those various provisions in pari materi, and they tell you, you know, we didn't just give the field over here to FERC just for kicks. We did it so they could exercise jurisdiction. Their jurisdiction is defined here. So I would say you read 201 and 205 together, and there is no question that – and this is where I think the field preemption argument becomes actually a narrow way to decide this case, because it combines – if you combine the bid and clear and the reality of everybody who's looked at the SOCA contracts, everybody who's looked at this, the district court here and the district court in Maryland, they've heard a lot of sophisticated arguments to the effect that these are not what they obviously seem to be. And they've heard all that evidence, and they've all decided, both judges have decided, no. It doesn't matter that you're telling these other people that they're going to pay you. You're getting two streams of payment, and it's contingent on bidding in and clearing the federal auction. So if you don't have any capacity sales, you don't get any money from anybody. But if you do, then we calculate how much you're going to get by what you got plus what you get under the SOCA. I mean, everybody who's looked at that says, good grief, that is a wholesale rate. I mean, it's complicated. It's more complicated than my hypo and just say the state says, and add 200. But it is a wholesale rate. The idea is to sell as much capacity as you can and to get as much as you can for it. Well, it is, and it isn't. Because, again, this gets back to the incentives that the states have. Because this whole thing is starting because they think the rates are too high. And so they figured out what it takes to get new generation. But then the reason they want to make sure they bid and clear is because if they bid and clear into the market, the price is going to go down. And that's going to benefit the states not just – it's not going to benefit the generation project itself. It will actually hurt them, except it won't hurt them because the SOCA comes in and makes them whole. And then they get the benefit on the back end of the rates being depressed. So it's really a twofer from the standpoint of the states. But it's not an innocuous twofer. It's a twofer with all of these distortive impacts on the market. I have just a few seconds left. I wanted to say a word about the Dormant Commerce Clause argument. It's an alternative ground. You don't need to reach it. But I think it's telling for one important reason. So we look at the statute. We look at the way it was first drafted. It says in New Jersey. It seems like a glaring Dormant Commerce Clause problem. Somebody notices that and says, no, no, community benefits. Well, I think we know what that means. But still, they come back and they say, no, no, you know, in theory, this plant could be built in Pennsylvania or even got one bid from Illinois. But in a weird way, that just shows you the huge preemption problem here. Because when Congress, in 1935 Congress, with a 1935 sense of what states could do, they didn't think the generation authority of the states was for New Jersey to decide to have a generation plant in Pennsylvania that affected the wholesale market. I mean, the very fact that in theory their effect on wholesale prices, which is what is the motivating factor behind the statute, could be achieved by citing new generation in Pennsylvania is actually a bad fact for them. Because it shows this is all about the wholesale market. This is not about the traditional citing decisions that Congress had in mind in 1935. Thank you, Your Honor. Thank you very much. Two minutes rebuttal. Oh, I'm sorry. One more. I forgot one of the troublemakers in the case. We're in this case because the court directed us to file a brief. But now that we've gone through this effort, we do agree with the appellees that the New Jersey mechanism is preempted. I am Robert Solomon. I'm the solicitor of the Federal Energy Regulatory Commission. But I appear today on behalf of both the FERC and the United States of America, and I very much appreciate this time granting my participation in oral argument. Can you address the issue or the accusation, I think it's the proper term, that you are taking different positions wearing a regulatory hat than you are wearing your hat as amicus? We are not taking a different position. In fact, just about every sentence in our brief is followed by a citation to an FERC or to a court decision. The FERC is a collegial body that prefers to speak through its orders. I was reluctant to prepare an amicus brief because we don't want the lawyers speaking for the agency. Having said that, we're very fortunate here because the commission, in the 2011 orders that were the focus of last month's decision, actually discussed the New Jersey program in light of the revisions that were necessitated in the aftermath of the New Jersey program. I've heard much about the Federal Power Act and the commission's jurisdiction over effects and whether the commission's exclusive jurisdiction is different depending upon whether it acts under Section 201 or whether it acts under Section 205 and 206, and I want to clarify that while the statute is phrased very broadly, the agency has jurisdiction over all rates and charges for or in connection with FERC jurisdictional transmission or wholesale sales, and we also have jurisdiction over contracts and practices affecting those rates and charges. There is a – Does that include the construction of new power plants, let's say, in New Jersey? When you say you have – I mean, it sounds like a very broad, expansive jurisdiction. Well, it's broad, but there's a limiting principle. First, with respect to the state authority over generation facilities in Section 201B, there is the caveat, except as specifically provided elsewhere in the statute, the federal government is relying upon the direct effect of the New Jersey program on the resulting wholesale rate, and our argument is based on the direct effect that the New Jersey program has. It's not in the statute, but there are decades of cases saying that the agency's authority over practices affecting doesn't cover, as appellants argued, all practices in the universe. There has to be a direct connection to the wholesale rate. It's the wholesale rate that the agency cares about. Sometimes the rate is a particular number. Sometimes it's a formula. Sometimes it's a process like we have here with the PJM option. But how do you get around Northwest Central Pipeline? Northwest Central Pipeline, the 1989 decision, had only an indirect effect on FERC jurisdiction. Here, as counsel have been arguing, it is the bidding and clearing requirement of the New Jersey statute that is particularly offensive, and as this court found just last month on direct review of the FERC orders, this court said that there is, in fact, a direct effect that is both squarely and exclusively within the FERC's jurisdiction. But you addressed it by entering that order that was upheld. Yes. We found that the replacement mechanism, removing the exemption for state-mandated resources, is just and reasonable. The suppliers might believe that it's not just and reasonable enough and that there's still some lingering concern, and that might have something to do with conflict preemption. I should point out that last month's decision is still subject to rehearing and Supreme Court review. As far as I know, the appellants believe that the agency still has acted unlawfully under the Federal Power Act and the Administrative Procedure Act. But we hope, and we're not too far from what I heard from Connecticut counsel, that this court try to stay as close to the facts of this case as possible and focus on the direct effect as opposed to focusing on the aggregate price or the guaranteed price offered by the New Jersey program. When you have the bidding and clearing, you have the direct effect that squarely implicates the FERC's jurisdiction under 201, 205, and 206 of the Federal Power Act. If you're simply talking about the price, the aggregation of the market clearing price and the contract for differences, then you start getting closer and closer to an indirect effect. We don't know where the line is. Isn't that what the District Court in Maryland and New Jersey, though, viewed it as? They only focused on the rate received, the money received, not the effect. No one talked about this bidding and clear problem. That is true. The basis for the field preemption was primarily on the aggregate price. There are some references in the District Court decision to the intrusive or encroaching effects. So I do not believe the District Court judge would disagree with what we are arguing now. The District Court did not have the advantage, as we do now, of the Third Circuit's February 20th intervening decision, which I think better focuses the debate on the direct effect. Mr. Solomon, I thank you very much. Thank you. For your argument, rebuttal. Mr. Engel. Thank you, Your Honor. I'll be brief because I know Mr. Elgarten has a little bit to say also. But I still just can't get over – I'm citing from page 41 of the opinion of this Court last month, which was quoting FERC's MOPR order in 2011, and it said, even if discriminatory subsidies are being received, if the resource is needed at the MOPR bid, then it is a competitive resource and should be permitted to participate in the auction, regardless of whether it also receives a subsidy. I just don't understand how that can be reconciled with the position that Mr. Solomon is taking today. And I also don't understand how Mr. Clement, with all due respect, can get up here and try to point as if it looks like New Jersey is doing something wrong with regard to the only one year needing to clear, when, one, FERC said that was okay, and, two, again, reiterate what was said earlier, 97 percent. This is in the record in this decision or in the record in the case last month. Ninety-seven percent of the utilities that bid into the market after the first year do so as zero bids. So the fact that we might be able to have zero bids really is not a problem here. And, in fact, MOPR talked about the issue of whether the subsidy, et cetera, and the price mitigation should go on for more than one year. And FERC said they were okay with only having to show that you could meet the one year requirement. So we think that we were being more than respectful. In fact, as we said earlier, it would have been wrong not to get involved with the normal FERC market process. And, therefore, we believe that this is an absolutely acceptable realm of regulation and law that New Jersey enacted and should be upheld. Mr. Rangel, thank you very much. Mr. Elgarten? We all agreed that you should read NJBPU to see what FERC actually ruled as an order in its official capacity as the regulator of the market under 205. I want to respond to the 15-year point, and I would like to respond to the NEPA because they didn't come up earlier. The 15-year point was specifically addressed by FERC in connection with NJBPU. The request had been made either to exclude these participants entirely or to at least make them bid a cost-based bid for three years in a row. FERC issued a ruling, and the results of that ruling are it rejected that. It rejected that because, and the site would be to 137 FERC. That's the 137 FERC opinion, and it's paragraph 132. It is summarized in the ruling of NJBPU. They explained that after the first year, once you've shown yourself to be a competitive resource, all of the costs for future bidding are sunk. That's why 97% of participants in the market bid zero. It's normal. And that FERC understands. It is only the new entrants who have to show a cost-based bid, and indeed, that's what CPB and HES did, complying with those rules. So let me turn back to the NEPA. In other words, they could control the 15 years. Would you like to hear about the NEPA or not? The NEPA was an internal rule. It would lock in the price for 3 years or 10 years internally to the market so that market participants would pay the subsidy, the additional payments. It was a very special rule, so in their capacity of regulating their market, they could well and properly determine that within that market, I don't want my market participants to pay a subsidy. It's very different from having someone outside the market pay subsidies, and it really says nothing about that rule. Thank you, Mr. Elgar.